[No. 1712.]

## THE STATE OF NEVADA, RESPONDENT, *v.* PATRICK DWYER, APPELLANT.

1. CRIMINAL LAW—VENUE—REFUSAL OF CHANGE—ABUSE OF DISCRETION.
Evidence in a homicide case showing deceased to be a man favorably and widely known in the county and defendant a stranger, the very general and unqualified belief in the county in defendant's guilt and a bitter feeling against him, and the knowledge of the jurors of such feeling and the possession by many of them of qualified opinions as to his guilt which would require evidence to remove, *held* to show an abuse of discretion in refusing a change of venue, under section 306 of the criminal practice act (Comp. Laws, 4271), authorizing removal on the ground that a fair and impartial trial cannot be had in the county where the indictment is pending.

APPEAL from the District Court of the Third Judicial District of the State of Nevada, Lander County; *Peter Breen,* Judge.

Patrick Dwyer was convicted of murder, and appeals. **Reversed,** and change of venue and new trial ordered.

The facts sufficiently appear in the opinion.

*James F. Dennis, P. A. McCarran,* and *William Woodburn,* for Appellant:

I. The court erred in denying appellant's motion for a change of venue. It appears from the record that on the 31st day of July, 1906, about 8 o'clock p. m., Patrick Dwyer shot and killed A. C. Williams and wounded his companion, Henry Dyer, on the main street of the Town of Austin. Patrick Dwyer was a stranger in Austin, and was not acquainted with A. C. Williams or Henry Dyer when he fired the fatal shot; he never spoke to either of them and never had any quarrel, altercation, or any trouble of any kind with either Williams or his companion. The shooting was done without any apparent or conceivable motive. It further appears that the deceased, A. C. Williams, was a young man reared in Austin, and at the time of his death was employed as conductor on the railroad connecting Austin and Battle Mountain. Henry Dyer lived twenty-six years in Austin, and is and was the county recorder of Lander County. Both of them were well known throughout Lander County. The kill-

ing of A. C. Williams and the wounding of his companion naturally aroused a feeling of indignation against his slayer throughout Lander County and engendered a bias and prejudice against him, so that it was impossible to procure a fair and impartial jury to determine his guilt or innocence of the crime charged against him.

II.   The action of the lower court in granting or refusing a change of venue is a matter of judicial discretion. If that discretion is abused it becomes the duty of an appellate court to afford relief. (*State* v. *Williams*, 3 Nev. 409; *State* v. *McLane*, 15 Nev. 345.)   The evidence hereinbefore set forth clearly shows that it was impossible to obtain an impartial jury, as there existed such a state of public excitement that even an impartial jury would likely be intimidated and overawed.

III.   The record shows that the peremptory challenges of defendant were exhausted before the completion of the jury. We respectfully submit that the court erred in disallowing the defendant's challenges to four jurors.   Considering that but one opinion existed throughout the county in regard to the guilt of the defendant, the number of jurors in that sparsely populated county who were examined and had formed a fixed opinion as to his guilt, the prominence of the deceased, A. C. Williams, and Henry Dyer, and the undisputed facts of the shooting, it is more than difficult to believe that these four jurors were fair and impartial.   Upon the question of their disqualifications as jurors, see *State* v. *Roberts*, 27 Nev. 467; *People* v. *Suesser*, 132 Cal. 632; *State* v. *McClear*, 11 Nev. 61.

IV.   We contend that it is not relevant or proper to show that the defendant has committed other similar acts or crimes which are not connected in any way with the one in question. The general rule is that evidence of other and distinct offenses than that alleged in the indictment is reversible error, even in a clear case of guilt.   There must be a logical connection between the two so that the one tends to establish the other, or when the two acts form but one transaction. (*Boyd* v. *U. S.*, 450; *Com.* v. *Jackson*, 132 Mass. 16; Hughes, Cr. Law & Proc. 3137–3139.)   The testimony must be confined to the issue.   "This rule excludes evidence of all collateral facts, or

those which are incapable of affording any reasonable pre-
sumption or inference as to the principal fact or matter in
dispute." (1 Greenl. Ev. 51, 52.) Upon the same ground it
is not competent for the prosecutor to give evidence of the
prisoner's tendency to commit the crime with which he is
charged. (Roscoe, Cr. Ev. 81, and cases cited; *People* v.
*Jones*, 31 Cal. 570, 571.)

*R. C. Stoddard*, Attorney-General, and *A. J. Maestretti*,
District Attorney of Lander County, for Respondent:

I. Appellant cites *State* v. *Roberts*, 27 Nev. 467. The case
is not in point, as the record in that case indicated that,
after talking with witnesses and persons who purported to
know the facts, the juror had formed and expressed an
opinion which, under the statute, rendered him incompetent;
in this case it merely appears that the jurors had formed
qualified opinions based on newspaper reports and general
rumor, and that, regardless of the source of information, their
minds were in a condition that rendered them competent to
serve. (*State* v. *Williams*, 28 Nev. 409; *People* v. *Owens*, 123
Cal. 482; *State* v. *Cunningham*, 100 Mo. 382; *State* v. *Simas*,
25 Nev. 432; *State* v. *Raymond*, 11 Nev. 98; 17 Am. & Eng.
Ency. Law, 2d ed. 1150.)

II. The motion for a change of venue was addressed to
the sound discretion of the trial court and on the showing
made by defendant and the counter showing made by the
state, the denial of motion was not an abuse of discretion.
(*State* v. *Gray*, 19 Nev. 212; *State* v. *Millain*, 3 Nev. 409;
*State* v. *McLane*, 15 Nev. 371; *People* v. *McCawley*, 1 Cal. 383;
*People* v. *Goldenson*, 76 Cal. 328; 4 Am. & Eng. Ency. Pl. &
Pr. 398; *Thompson* v. *State*, 123 Ala. 12; *Haws* v. *State*, 88
Ala. 37; *Raines* v. *State*, 88 Ala. 91; *Territory* v. *Barth*, 15
Pac. 673; *People* v. *Mahoney*, 18 Cal. 180; *People* v. *Congleton*,
44 Cal. 92; *Gitchell* v. *People*, 37 Am. St. Rep. 147; *Hickman*
v. *People*, 137 Ill. 75; *State* v. *Williams*, 115 Iowa, 97; *State*
v. *Egerton*, 100 Iowa, 63; *State* v. *Weems*, 96 Iowa, 426;
*State* v. *Daugherty*, 63 Kan. 476; *Dilger* v. *Commonwealth*, 88
Ky. 550; *People* v. *Sammis*, 3 Hun, 560; *State* v. *Russell*, 32
Pac. 854; *Goldsberry* v. *State*, 92 N. W. 906.)

*James F. Dennis*, for Appellant, in reply:

I. The court erred in denying defendant's challenge to juror L. A. Lemaire. The juror, on his *voir dire*, expressly states that he expressed an unqualified opinion as to the guilt or innocence of the defendant, and it can make no difference under the law of this state what qualifications he had in his mind; the fact remains that he expressed an unqualified opinion and was the subject for challenge for implied bias under section 340 of our criminal practice act. (*State* v. *Roberts*, 27 Nev. 467.)

II. The court erred in denying defendant's challenge to juror Hunt, for the reason that the juror had expressed an opinion that the defendant was guilty, and was at the time of his examination of the opinion that the defendant was guilty of the homicide. (*State* v. *Roberts*, 27 Nev. 467.)

III. We now come to the denial or overruling of defendant's motion for change of venue, and upon this question the entire examinations of all the jurors are involved as well as the conduct of the court just referred to in our specifications of error. We call the court's attention to the bill of exceptions, together with the general affidavits and motions made by defendant for change of venue and submitted; that from an examination of this record it shows conclusively that the defendant could not and did not have a fair and impartial trial as guaranteed to him by the constitution of this state, which means an impartial trial. (Cooley, Const. Lim. 390; *People* v. *Powell*, 37 Cal. 348.) The fact that the jury was obtained was not conclusive that it was a fair jury, or that the verdict of that jury was uninfluenced by the bias and prejudice that existed against the defendant at the time of the trial. In fact, the entire record and examination of 179 talesmen to procure 12 would mean that 167 persons were disqualified, which shows conclusively that over 90 per cent of the qualified jurors in the county, had formed and expressed an unqualified opinion as to the guilt of the defendant, as most of them expressed it.

IV. The denial of the several motions for change of venue in this action simply amounts to a denial of justice, and the record shows that even the court became imbued with the

feeling of prejudice and bias which existed against the defendant. The statute of our state provides: "A criminal action, prosecuted by indictment, may be removed from the court in which it is pending, on the application of the defendant or state, on the ground that a fair and impartial trial cannot be had where the indictment is pending," which means the same thing. (Comp. Laws, 4271; *State* v. *Millain*, 3 Nev. 409; *State* v. *McLane*, 15 Nev. 345; *People* v. *Suesser*, 132 Cal. 632.)

V. The court's comments and remarks concerning the qualifications of jurors, and their failure to qualify, and his comments upon the severity of the case, were expressions of opinion upon a question of fact, which entitles defendant to a reversal of the case upon that ground alone.

By the Court, NORCROSS, J.:

Appellant was convicted in the Third Judicial District Court in and for Lander County of the crime of murder in the first degree and sentenced to be hanged. From such judgment he appeals.

The principal question presented upon this appeal is whether or not the court erred in denying the defendant's various motions for a change of venue. Section 306 of the criminal practice act (Comp. Laws, 4271) provides: "A criminal action, prosecuted by indictment, may be removed from the court in which it is pending, on the application of the defendant or state, on the ground that a fair and impartial trial cannot be had in the county where the indictment is pending."

In the case of *State* v. *Millain*, 3 Nev. 432, this court said: "There are few cases that present themselves to appellate courts where it is more difficult to determine upon any settled principles or rule of action than in these cases relating to a change of venue. By all it is admitted that there is a broad discretionary power allowed the court of original jurisdiction. But, whilst that court has such discretion, it is still a judicial and not an arbitrary discretion. If that discretion is used in an arbitrary and oppressive manner, an appellate court is bound to correct the error. But to distinguish between what

is and what is not an abuse of that discretion is often a very
nice and difficult question.   There are two circumstances, the
existence of either of which should entitle the defendant to
a change of venue.   The. one is the impossibility of obtain-
ing an impartial jury.   The other is such a state of public
excitement against the defendant that even an impartial jury
would be likely to be intimidated and overawed by public
demonstrations against the accused."

Commenting upon a similar motion in the case of *State* v.
*McLane*, 15 Nev. 372, this court said: "On the whole, we
think the application in this case for a change of venue was
not materially stronger than that in the case of Millain (3
Nev. 433), where the order overruling the motion was affirmed
by this court.   It is not shown in this case, any more than in
that, that the. parties threatening violence to the defendant
were either numerous or influential; and we do not under-
stand that the mere prevalence of a belief in the guilt of a
prisoner, however widely diffused, is a circumstance from
which it must be inferred that a jury would be intimidated
or overawed."

Again, in the case of *State* v. *Gray*, 19 Nev. 215, 8 Pac. 457,
this court had the following to say in reference to a motion
for change of venue: "Defendant applied for a change of
venue on the ground of prejudice existing against him in the
county where the indictment was pending which would pre-
vent him from having a fair and impartial trial.   The appli-
cation was based upon affidavits tending to establish the fact
alleged, and resisted by counter affidavits.   It·is unnecessary
to consider the contents of the affidavits.   The district court
overruled the motion for the time being, until it could be
shown by an examination of a sufficient number of jurors
that a fair and impartial jury could not be obtained.   After
examining eighty-one persons a jury was impaneled.   The
statute authorizing a change of venue in criminal cases pro-
vides that, before granting the order, the court shall be sat-
isfied that the representations of the moving party are true.
The question whether a fair and impartial jury could be
obtained depended largely upon the opinions of witnesses.
Opinions differed widely, and the court adopted a very satis-

factory test to ascertain the fact.   The practice pursued was approved in *State* v. *Millain*, 3 Nev. 433, and by the Supreme Court of California in *People* v. *Plummer*, 9 Cal. 299, and in *People* v. *Mahoney*, 18 Cal. 181."

The foregoing furnishes about all the light we may gather from the decisions of this court upon a question like that here presented.   Outside of the fact that every case where a change of venue is sought must come within certain broad principles, each case must be determined upon its own particular facts.

The defendant's motion for a change of venue under the provisions of the statute was first made on September 26, 1906, after two days had been spent in examining jurymen, and after eighty-one jurymen had been examined upon their *voir dire*, with the result that only eleven had been passed, three of whom were passed over defendant's challenge for cause.   At this time none of the eight peremptory challenges allowed to each side had been exercised.   The motion was based upon a lengthy affidavit of the defendant, affidavits of defendant's three attorneys, and the testimony of witnesses taken before the court.   Affidavits and the testimony of witnesses in opposition to the motion were also offered by the state.   After considering the evidence in support of the motion at length the court said: "I think I shall overrule the motion, with permission to the defense to renew it at the close of the examination of the jurors in attendance to-morrow."   Pursuant to the ruling of the court, on September 29th, and after one hundred and three jurymen had been examined and the jury list exhausted without securing a jury, the motion for a change of venue was renewed, and based upon the additional showing of the jurymen examined since the motion was first made.   The court examined the sheriff as to the number of electors who in his opinion were left in the county who would be subject to jury duty, and the sheriff gave it as his opinion that there were one hundred and fifty, approximately.   The court denied the motion, and a recess was taken until 10 o'clock a. m. on October 1st, at which time the court notified counsel that he had submitted to the county commissioners the selection of one hundred and fifty more names

for jurymen. At the session of court held on the 1st day of
October the motion for change of venue was again renewed,
and denied by the court. The court announced that he would
issue a venire for one hundred names, stating at the same time:
"I do not know whether you [the sheriff] can find one
hundred and fifty in the county or not." A recess was then
taken until October 10th. On the day last mentioned court
convened, and all the new veniremen responded to their
names, excepting twenty-six who were returned as sick, out of
the county, or not served. Immediately after the convening of
court counsel for defendant presented a motion, supported
by the affidavit of the defendant, for leave to examine the
eight jurors who had been passed and who were in the box
at the time the recess was taken on the 1st of October,
because of a certain alleged threatened assault upon the jail
to secure the person of the defendant by violent means, which
alleged threatened assault it was alleged might have come to
the knowledge of the jurymen in the box, and, further, because
of certain remarks of the county clerk made in the hearing
of certain of the talesmen. The hearing upon this motion
was in the absence of the jury. T. A. Oliver, the deputy
sheriff and jailer, testified that during the recess of the court
he had been informed by George Watt, an ex-sheriff of the
county, "that there was going to be an effort made, or very
likely to be an effort made, to take the man from the jail and
lynch him, and I had better be very cautious and get help if
I could. He (Watt) said he could not find out the parties,
but he was told that the man would not be allowed to leave
town; that it was either lynch him or break the county. I
asked him if he could do nothing in the matter, and he said
he did not know whether he could or not. If it was possible
he would do so. He came to me the next evening and told
me there would be nothing done at present." The witness
further testified to the effect that Watt informed him "that
he did not know where the parties were coming from, but
that he was satisfied that they were from out of town; that
he (Watt) had been asked to take part." Mr. Watt was out
of town at the time the motion was presented, and, although
a subpena had been issued for him, the sheriff had been

unable to serve it, and consequently the testimony of Mr. Watt was not at the time obtainable.

With reference to the matter of the statements of Mr. Dron, the county clerk, it had previously been shown by affidavit and the testimony of witnesses that Dron had remarked to one of defendant's counsel, within the hearing of the talesman: "I'll tell you one thing, if I had been in Austin when this occurred, you would not have been put to the trouble of trying the case." Because of this remark by the clerk, the court ordered him to provide a deputy and refrain from attendance upon the court. With regard to the remark in question the court, in considering the motion now under discussion, said: "You have already made a showing that the eight jurors in all probability heard the statement made by Mr. Dron, and, as it was not contradicted, it must be accepted as a fact." Upon the showing thus made the motion for leave to reëxamine the jurors then in the box was denied, and the examination of the talesmen on the new venire was proceeded with, and a jury finally obtained; the defendant in the meantime having exhausted all his peremptory challenges. Upon finally securing the jury counsel for defendant asked for and were granted until the following day to prepare affidavits in support of a renewal of the motion for a change of venue.

The final motion for change of venue was as follows: "The plaintiff will please take notice that on the opening of said court on the 12th day of October, 1906, the defendant will move said court to change the place of trial of said action to some other county within said state. Said motion will be made and based upon the ground that a fair and impartial trial cannot be had within the County of Lander, which is the county where said defendant was indicted and where said action was set for trial, for the reason that ninety-eight per cent of the people of said county are incensed and angry at the defendant, and are clamoring for his life, and have threatened him with violence prior to the date of his said trial and since said trial has been in progress. At the hearing of said motion said defendant will use his affidavit, a copy of which is hereby attached, a copy of the testimony of

the witnesses heretofore testifying on a similar motion, and the affidavit used on said last-named motion, together with the stenographic copy of the. *voir dire* of the jurymen E. W. Hunt, J. A. Hoskins, and Geo. Litster; also the stenographic report of the examination of all the jurors examined in said case since the 24th day of September, 1906, and all of the records and files of said case, together with the testimony of Scott Hickey and the testimony of one Plummer."

Without setting forth the contents of the numerous affidavits filed in support of the various motions for a change of venue, we will review the testimony of various witnesses in support of and in opposition to the motion, and state certain facts which are either admitted or clearly established by proof. The defendant, Dwyer, shot and killed one A. C. Williams on one of the principal streets in the Town of Austin about 8 o'clock of the evening of July 31, 1906. At the same time he shot one Henry Dyer, the companion of Williams, inflicting a wound on Dyer which rendered him a cripple for life. There is nothing in the record showing or tending to show any motive upon the part of the defendant that would cause him to wish to kill Williams or injure Dyer. In fact, it appears undisputed that the defendant was not even acquainted with the deceased, and had only a slight acquaintance with Dyer, and that acquaintance entirely friendly. . The theory of the state, if we understand it, was that the defendant killed Williams by mistake, thinking the latter was one O'Brien, a man with whom defendant had had trouble during the day over a prostitute. Williams, the deceased, was a young man highly respected in the community, where he resided with his parents. He was conductor on the local narrow-gage railroad running between Austin and Battle Mountain, the only towns of any considerable importance in the county. He was known by the majority of the people, and was regarded as a very popular young man. Dyer, the wounded associate of Williams, was at the time county recorder, a man almost universally known in the county. The defendant had only been in Austin and in the county a few days when the homicide occurred. He was a gambler by occupation, and was without friends, and had but

few acquaintances in the county where he was to be tried for his life. It does not appear, and is not likely from the facts shown, that he had many friends of influence at any place. The shooting down of two prominent citizens of Lander County upon one of the principal streets of the county-seat, without any apparent cause, by a stranger whose character was not of the best, was something that quite naturally would arouse general public indignation. Immediately following the homicide it is shown that threats of violence against the defendant were made; some of these threats being made by prominent citizens both at Austin and at Battle Mountain. Whether or not there was ever any real danger of mob violence, the public feeling was such that the sheriff and peace officials of the county deemed it necessary to take precautions for the safety of the prisoner. The public feeling immediately following the homicide and at the time of the trial may be indicated by the following extracts from the testimony of witnesses given in support of and in opposition to the motion for a change of venue:

P. A. McCarran, one of the defendant's attorneys, testified: That in conversation with C. F. Littrell, the postmaster of Austin, during the progress of the trial, the latter remarked concerning the defendant: "It would be a hell of a jury that wouldn't convict that fellow." Also that in a later conversation Mr. Littrell said: "If he was acquitted tomorrow, he would not be apt to get out of town alive."

C. F. Littrell testified as follows: "I asked McCarran if he was one of the counsel, and told him he had a pretty hard fight here, and he said: 'Would you want to proffer a box of cigars that we do not clear him?' I said: 'It would be a hell of a jury that would turn him loose.' * * * Q. Is it not true that the opinion you expressed is entertained by all the intelligent members of this community? A. At the. time the thing happened there was quite a feeling, but I cannot say that I have heard anyone express themselves lately. Q. Have you ever heard anybody express themselves contrary to the opinion that you expressed yourself? A. No, sir. * * * Q. Do you remember expressing a further opinion to Mr. McCarran with reference to the probable result

to the defendant in case he should be acquitted on this trial?
* * * A. I remember saying that I thought that if the
officers had not made the arrest as soon as they did, and the
defendant had attempted to get out of town, I do not think
they would have ever had him locked up. Q. You mean
that he would have been lynched? A. Yes, sir. Q. The
public feeling at that time was very strong? A. Most
assuredly. Q. If the officers had not got hold of him, the
people would have lynched him? A. Yes, sir. Q. The feel-
ing against the defendant at the present is very strong, as
far as you know? A. I have not discussed with anybody
except Mr. McCarran recently. I remember telling Mr.
McCarran about the first part of it. Q. Did you hear Mr.
McCarran testify this morning? A. Yes, sir. Q. Wasn't
his testimony with reference to this matter substantially
correct? A. I would differ in the point as to whether I said
he would not get out of this trial, or whether I said when
the arrest was made. I will not be positive about that.
* * * Q. Don't you think that the condition of public sen-
timent with reference to this matter will have some slight
effect on any jury that is impaneled to try the case, however
fair the jury might be? A. I could not say in regard to
that. Of course, it might have some; but I don't see why
a man could not be conscientious in the matter."

C. B. Francis, a native of Austin, testified that he saw the
remains of A. C. Williams and the condition of Henry Dyer
after the shooting; that the general expression of opinion
was that the party who killed him "ought to be hung—
summarily executed"; that he heard several expressions of
opinion that he ought to be lynched. Subsequently the wit-
ness Francis was employed as a deputy sheriff to assist in
guarding the prisoner. Witness testified that after he was
so employed he was approached by two or three parties and
asked if he would take a hand in lynching the defendant.

H. Warren, one of defendant's attorneys, testified that
he had talked with more than fifty persons at Battle Moun-
tain and Austin with a view of ascertaining what the feeling
was in Lander County relative to the defendant, and that he
had not heard an expression of opinion favorable to defend-

ant, but that he had invariably heard expressions of opinion strongly unfavorable to him.

R. R. Landes, an employee of the Bank of Austin, testified substantially to the following effect: That from the expressions of opinion that he had heard the feeling in the community was not at all in favor of the defendant, and in the majority of cases was very strong against him. On the night of the killing, witness testified, he heard two or three persons express themselves to the effect that the defendant should be lynched.

T. A. Oliver, deputy sheriff and jailer, testified to the following: "Q. You have had an opportunity since to learn what the public opinion is with reference to the defendant? A. Yes, I have heard talk. Q. Will you state whether or not, as far as you have heard, that it is favorable or unfavorable? A. I should say it is unfavorable. Q. Very unfavorable? A. I should say very unfavorable. Q. To what number of people of Lander County does this feeling extend? A. I could not say. Q. Do you think it is entertained by a small number or a large number? A. Judging from our efforts to select a jury, I should say quite a large number of people. Q. Do you think that a jury, if selected in this case, will not be influenced by that opinion? A. I would not like to say whether I do or not. Q. Don't you believe, from your knowledge of the situation, that a jury that failed to find a verdict for conviction would receive a very hot reception in the Town of Austin? A. I believe they would. Q. You believe a verdict of that kind would be very unpopular? A. Yes, sir. Q. Don't you think that the fact that it would be unpopular would influence a jury in arriving at a verdict? A. I have no right to say. Q. What is your opinion? A. If I were a juror, I would say it would have no influence. Q. With your knowledge of juries here and the community, do you think that a jury will not be influenced to some extent by the public feeling that exists? A. If a juror qualifies, he should not be so; but I should not like to say that I believe he would be. That is going too far."

Charles A. Cantwell, assistant cashier of the Bank of Austin, also an attorney at law, testified as follows: "Q.

Some time along about the 31st day of July or the 1st day
of August you were asked to counsel with or see the defend-
ant, were you not, or told that you could have the case, or
something to that effect? A. I think it was some time within
a week after the killing of Mr. Williams that Sheriff Murphy
came to me. I don't remember just what the proposition
was, but the idea he gave me was that I could have a place
in the defense of this case if I desired it. Q. What did you
reply? A. I told him that I did not want it. Q. Why? A. I
told him in the first place that it was the unpopular side of
the case, and I did not care to go into it, and my own feelings
were such that I did not feel that I could do Dwyer justice as
an attorney. Q. What did you consider the feelings as against
the defendant? A. I took it that his position was so unpop-
ular that I would injure myself in the long run by taking any
part in the case. Q. Do you think there has been very much
of a change since that time? A. No, sir; I do not. * * *
My friendship for Henry Dyer, and my friendship and respect
for Bert Williams, and the general view that I took of this
killing, were such that I could not go into the defense of
this man with my whole heart and soul, and give him what
he was entitled to get from me as an attorney under the oath
that I have taken before this court. * * * Q. Mr. Cantwell,
what did you consider the public opinion in this town and
this vicinity with reference to the guilt of Mr. Dwyer at the
present time? A. I should judge it is almost the unanimous
opinion of the community that he is guilty of the offense
charged against him. Q. Do you believe, from your own
experience, that any one, being in this town and community
at the time of this occurrence, and remaining here ever since,
could escape a feeling in this matter? I mean a feeling of
resentment against the defendant? A. No; I do not think
they could. * * * Q. Do you not believe that any jury
impaneled to try this case would be to some extent influenced
by the feeling of prejudice against the defendant, which you
say exists in this community? A. Of course, there is a possi-
bility that you could get a jury so strong-minded that they
would not consider this; but I do not believe that it is possible.
Q. To get a jury that would not be influenced to some extent

by the feeling of the community?    A. I think it would not be possible to get such a jury."

N. E. Bartoo, master mechanic of the Nevada Central Railroad Company, testified as follows: "Q. Do you know of any excited condition of public feeling at Battle Mountain?    A. Yes, sir; it was very strong.    Q. Is it right now?    A. Yes; there is some feeling there yet.    Q. What were the manifestations, so far as you remember, of that feeling?    A. The feeling was that they wanted to hang Dwyer.    Q. You mean by that they wanted to hang him by violence?    A. Yes, sir; they talked about lynching.    Q. Were you present at any meeting that was held there?    A. There was not any meeting.    It seemed to be a general feeling with everybody.    Q. Didn't some of them, with the view of carrying into effect the general public sentiment, arrange for car or engine to come to Austin?    A. They asked me if they could get an engine to bring them up here; I told them, 'Yes'; that I would run the engine and help pull the string.    Q. How long was that after the death of Mr. Williams?    A. It was on the 1st of August.    Q. Did you meet Mr. Watt when you came to Austin?    A. I met him the first time after I came up to the funeral, in the afternoon about 2 o'clock.    Q. Did you have some conversation with him regarding what ought to be done regarding the matter?    A. We talked the matter over, and he said: 'I don't know as we can do anything now.    We might see Williams, and if he wants to do anything, it is not too late yet.'    I said if there was anything doing I would stay.    Q. Were you discussing the lynching of defendant?    A. Yes, sir."

George Watt, ex-sheriff of Lander County, testified as follows: "A. I have forgotten whether it was the day before Bert was buried, or the day after.    *  *  *    I met Bartoo in front of the postoffice, and we talked about the murder, and he asked me what I thought about it.    I told him I thought we ought to hang him (Dwyer); but I said that, if his father would not take the interest, I did not feel as if I cared to put myself out.    Bartoo said, 'We will go down and see Williams,' and I said 'All right.'    As we walked down the street, we met him at the corner of Bray's, coming down the hill.    We put the facts before him, and he said that he did not care to see

any more of us get into trouble, and would rather we would let it drop. I said 'We will let it drop right here,' and since then I have taken no interest in the case. Q. You are quite extensively acquainted in Austin? A. Yes, sir; I know every one here. Q. Did you hear many expressions of opinion as to what ought to be done to Dwyer? A. No; I was very busy at the time, and did not hear very much talk. As far as I heard was a general expression of opinion. All were very much worked up over the matter, nearly every one. Q. The feeling was strong against Dwyer? A. Yes, sir."

A. J. Maestretti, district attorney, called by the defense as a witness in support of the motion, testified to certain precautions taken by the sheriff to protect the defendant in case of threatened danger, after which the following questions and answers appear in his testimony: "Q. You thought it necessary to take extra precaution? A. I did not think it was absolutely necessary. It is a fact that I thought a great many of the people were very angry and excited about this affair, and if Dwyer should be taken out without proper precaution, and lose his life, it would be a sad reflection on the officers of this court, and it was to take every precaution that, in the event of anything of the kind did occur, the prisoner would have all the protection it was possible to give him. Q. You must have thought there was some danger? A. I thought there was a possibilty of an attempt to get him. Q. You thought that by reason of the excited condition of public opinion? A. Yes, sir."

M. J. Murphy, sheriff of the county, was called by the state and gave the following testimony: "Q. Were you here July 31st last? A. No, sir; I arrived here on the 1st of August. Q. Did you, on that day, or any day subsequent to that time, witness the gathering of any mob making any violent manifestations, demonstrations, or clamoring for the life of Dwyer? A. Well, I did see several little crowds around. Q. Did you hear them encouraging or soliciting each other or any one to make an attack on the jail or otherwise get possession of Dwyer? A. I did not hear them, but surmised what was going on. Q. You saw people standing together talking, and you surmised that

they were discussing that subject? A. Yes, sir. * * *
Q. You took what steps were necessary, according to your
judgment and those with whom you advised, for the safe
care and protection of the defendant? A. I did. Q. Is it
not a fact, Mr. Murphy, that you openly and on more than
one occasion said that any who made an attempt to take the
life of· Dwyer would have to do so over your dead body? ·
A. I did." On cross-examination the witness testified: "Q
I understood you to say you were at Battle Mountain when
this thing occurred? A. I was. Q. Did you hear anything
of the excited condition of public opinion at that time?
A. I did. Q. By reason of which you telegraphed special
instructions to the deputy here to take special precautions?
A. Yes, sir; I wired him to capture the man if possible,
and use all precaution for protection. Q. The reason of
that was you were aware of the condition of public opinion?
A. Yes, sir. Q. When you came to Austin, wasn't the con-
dition of public opinion, to your mind, in such an excited
state that you thought it was necessary to . employ extra
guards. A. I did. Q. You did employ extra guards? A.
Yes, sir. Q. How many? A. Four. * * * Q. You have
quite an extensive knowledge in this county? A. Yes, sir.
Q. Doesn't the feeling that existed in Austin at that time
with reference to . this defendant extend generally to the
county? A. As an officer I hear more or less of it going
around. Q. You hear a good deal? A. Yes, sir. Q. You
regard it as being general? A. In a sense I do. Q. As an
officer, do you believe that, with the present state of public
feeling in this county, a fair and impartial jury can be
obtained to try this case? A. That is a very hard question for
me to answer. I believe it is possible to get twelve men here.
There are good square men here. Q. Do you think it prob-
able? A. I will say it is possible. Q. During the time these
hostile demonstrations and feelings prevailed against the
defendant, did you not, on more than one occasion, have to
tell people in this town that they could not take Dwyer unless
they took him over your dead body? A. I did. ·Q. Did you
believe it necessary to make those statements? A. Yes, sir."

L. A. Weller, justice of the peace for Austin, was called by

the state and testified to the following: "Q. Do you believe
it is probable at this time, from your experience and opinion,
and what you have heard, that a fair and impartial jury can
be secured in this case? A. I have never seen any demon-
strations that would lead me to fear for one moment that
there would be any violence or attempt to take the defendant.
I have heard it talked about more here to-day than at any
other time. Q. Do you believe that there is any existence of
any such feeling that would have any influence whatever on
a jury sworn to try the case? A. I do not think there is.
I have not heard anything that would lead me to believe
that there was any violence contemplated. Q. Do you believe,
from what you have been able to hear, that in the event
that a jury was secured to try this case, and they would
render a verdict of acquittal of this defendant, that they
would be subjected to any abuse, contempt, or anything of
that kind? A. None whatever. If he was entitled to an
acquittal, I think the community would applaud the act of
the jury." Upon cross-examination the witness gave the fol-
lowing testimony: "Q. Didn't you hear, since this killing
occurred, and haven't you heard frequently, expressions in
this community against the defendant? A. I have heard
expressions against lots of people. Q. Did you hear any
expressions against the defendant? A. Not particularly. Q.
Expressions of opinion characterizing the offense? A. I have
heard criticisms upon his acts. Q. Were they favorable or
unfavorable? A. I have heard several people say he ought
to be hung for his act. Q. Didn't you yourself say that if any
man ever deserved hanging it was this defendant? A. No, sir.
Q. Didn't you say that in front of this court house? A. I said
if the man had committed the offense, in all probability he
would be hung. Q. If he committed the offense he ought to
be hung? A. It was first reported that he killed these two
people in cold blood. I said: 'If that is true, he deserves to
hang.' Q. What was it that you said with reference to the
defendant and what ought to be done to him? A. I said, If
he was guilty of the cold-blooded murder, he should hang."

Dr. A. L. Mann, a physician residing at Austin, testified
on behalf of the state as follows: "Q. Have you heard any

expressions of feeling with reference to this defendant? A. Yes, sir; I have heard a good deal of adverse criticism of his act, and the opinion that the penalty of the law should be visited upon him. Q. Have you heard anything favorable to him in the way of expressions? A. I did hear that there was a good deal of sympathy being manifested, but from what quarters I could not tell. Q. Did you witness the gathering of any mobs, at or about any of those times, for the purpose of taking the defendant's life? A. No, sir. Q. Did you know of any such act? A. No, sir." Cross-examination by Mr. Warren: "Q. You say you have heard some expressions of sympathy in certain quarters, but you do not know the quarters. A. I said I heard that there were some expressions of sympathy, but from what quarters I did not know. On the 19th of August I was introduced to a gentleman for the first time, and the conversation led up to the recent tragedy, and about the second expression that the gentleman made to me was that there were a great many people in Austin who were sympathizing with the defendant. He was a stranger here. Said he had never been here before, and I did not ask him for specific information as to who was expressing sympathy for the defendant. Q. It is a wonder that you did not have some doubts as to his sanity. A. Yes, sir; I did, but he proved to be a very intelligent man. Q. Have you ever expressed your opinion in a public way? A. Yes, sir. Q. You have heard a number of people express the same opinion that you entertain? A. Not quite as strong as I did. Q. It was not favorable to the defendant? A. No, sir. Q. Outside of this solitary instance, you have heard no expressions of sympathy for the defendant? A. No, sir." Redirect: "Q. You have stated that you stated your opinion very emphatically. Have you any objection to stating at this time the expression that you made? A. No, sir. I said that if the defendant had killed my boy in the manner in which he had killed that boy, if I could get hold of my pet rifle, I would get him if it was the last thing I did on earth."

A. B. Cooper, called on behalf of the state, testified as follows: "Q. I want to read you a little portion of the affidavit of Mr. Dwyer at the bottom of page 9. (Reads portion of ·

defendant's affidavit concerning A. B. Cooper.) Mr. Cooper, what have you to say as to the truth of those matters? A. I don't think it is as it ought to be. I did not make any remark that I would lose my license if I testified in this case. I did talk with Mr. Warren, and he asked me a few questions, and I told him I thought I did not know enough about it to make a witness, and I asked him if the prosecution did not subpena me, if he would not, and he said, 'No.' Q. Did you say you were afraid to be called as a witness because your business would be ruined? A. No, sir. Q. Did you say your license would be taken away from you? A. No sir. Q. If you knew any testimony that would be favorable to Dwyer, would you hesitate on any account to give him the benefit of that testimony? A. No, sir." Upon cross-examination the witness testified as follows: "Q. Didn't you tell me, Mr. Cooper, that you wanted to be left out of it; that it was hurting your business? A. No, sir; I just said that the killing had hurt business all around. Q. Didn't you say that it hurt your business especially? A. It hurt my business the same as anybody else. Q. Didn't you say it would hurt your business if you testified in favor of the defendant? A. Yes, sir. Q. By reason of it being supposed that you were for the defendant? A. No, sir; I said if I should sympathize with him in any way it would hurt my business."

S. E. McIntyre, called on behalf of the state, denied certain allegations in defendant's affidavit that he (McIntyre) had made any violent expressions concerning defendant, or that he had at any time solicited or encouraged the doing of any violence to defendant, or that any one invited or solicited him to engage in any unlawful act towards the defendant, or that he knew of any mobs for such purpose. Upon cross-examination the witness testified: "Q. The people thought he ought to be punished for committing the crime. That feeling was general? A. I should judge so. Q. It extends to every one you know around here? A. Yes, sir; I think most every one is of that opinion. Q. Entertains a feeling against the defendant? A. I don't know as it is against him. Q. I believe you said you thought he was guilty? A. A man is not guilty until he is proven so. Q. It is a general opinion

that he is guilty?   A. Yes, sir.   Q. All it needs is the stamp
of approval of the court and jury?   A. Yes, sir; to be legally
guilty.   Q. That is the general feeling, is it not, here?   A. As
far as I know.   Q. Don't you think that general feeling is
going to influence any juror?   A. No, sir; I don't know as it
would.   Q. Do you think that you could get two people out
of Austin that would be free from that feeling?   A. I think
you could out of the county.   Q. What part of the county?
A. From different parts.   Q. You do not know where there
are enough people residing to obtain a jury?   A. No, sir."

The state also introduced a number of affidavits denying
portions of the defendant's affidavits wherein he charged the
affiants as advocating violent measures against him, but
which did not refer to the feeling generally in the county.

Upon the last renewal of the motion for a change of venue
the defendant offered the following testimony:

Scott Hickey testified as follows:   "Q. What was your
occupation formerly?   A. An officer.   Q. In Nye County?
A. Yes, sir?   Q. How did you first happen to come to this
county?   With reference to the case now on trial?   A. At
the request of Mr. Lynch and a man named Goodfriend, who
loaned a team to these boys that came in here.   Q. For what
purpose?   A. Mr. Goodfriend wanted me to get the team,
which I understood they were trying to sell, and Mr. Lynch
wanted me to come, as Mr. Dwyer was in this trouble, because
he thought I was pretty well acquainted here, and there was
some pretty bad talk being made.   *   *   *   Q. Where have
you been, out of town, since that time?   A. In Battle Moun-
tain, Bullion, Tonabo, and here again.   Q. During all of the
several times that you have been in this county, and the
several places you have been, have you conversed with many
citizens of this county relative to the defendant?   A. Yes,
sir; I have conversed with quite a number.   Q. Approxi-
mately how many would you say?   A. I don't know.   I have
talked more or less every day, and with a great many differ-
ent people.   Q. Have you talked with a hundred people?
A. Yes, sir.   Q. In consideration of your talking with that
number of people, what would you consider the feeling here
is toward the defendant?   *   *   *   A. Against him.   Q.

In what degree, mildly or strongly? A. Strongly against him. Q. Angry and excited? A. Well, they speak very strongly against him, not in his favor by any means. There is no sympathy for him." Cross-examination: "Q. How long have you known the defendant? A. I think about a year and a half  Q. You are friendly disposed towards him? A. Yes; by meeting him and speaking to him."

George Watt testified concerning his informing Deputy Sheriff Oliver of an alleged attack on the jail as follows: "A. I believe it was a week ago yesterday. Henry Dyer telephoned up to me that he would like to see me, and I came down. I met him in the door of the saloon. He called me back and said he wanted to talk with me. He was pretty much under the influence of liquor at the time. He said: 'I have been thinking this matter over, and partly made up my mind to get that fellow if I can get some of the boys to go with me; but I don't want to do anything where I would have to hurt Al. Oliver.' He asked me to ask Oliver how he felt about it. He said: 'I am a cripple for life, and he killed one of my best friends, and I am pretty much enraged over it.' I went to Al., and he said to tell the boys they had better not come. * * * Mr. Dyer was the only person who spoke to me about it, and he mentioned no associates. He said he thought he could get some of the boys to go with him. I spoke to Henry the next morning, and he said he would say no more about it. Q. From your own observation, knowledge, and intercourse with the people, what would you consider the state of public feeling against this defendant throughout the county? A. At the time it happened it was pretty strong, but I believe right now I could try Mr. Dwyer. Q. You think you could try him, and give him what you believe he is entitled to? A. Yes, sir; and not any more, either. Q. Don't you think it would take a good deal of evidence to make you turn him loose? A. I would surely turn him loose if he was innocent. Q. You say that you believe you are in a condition to try him. You believe you know the state of facts, and from that state of facts he deserves punishment? A. From my condition at present, it is hard to tell what I would do."

Recross-examination by Mr. Maestretti: "Q. Isn't it what you mean to say that, if you were taken as a juror, if the state did not show you something in the way of evidence, you would not convict him? A. No, sir. Q. You believe now that, although you may have been somewhat excited at first, now you would be absolutely fair? A. Yes, sir. Q. Don't you believe that that is the statement of most of the people? A. It ought to be."

H. W. Dyer testified as follows: "A. What Mr. Watt said was true, except that I said I had made up my mind to get this fellow. I do not want to be understood as saying that I had made up my mind to get this defendant; but what Mr. Watt said was true in all other respects. * * * Q. Was there anything further back of your declaration to Mr. Watt? Had you consulted anybody or taken any steps toward forming a mob? A. I just asked Mr. Watt's advice."

H. J. Plummer was called by the defense and testified that he had resided in Austin since the 21st day of May preceding; that he had heard E. W. Hunt, one of the jurors selected to try defendant, remark concerning the defendant: "The ——— ———, they ought to hang him." E. W. Hunt was subsequently examined, and denied that he had ever made such a remark.

The foregoing contains substantially all of the material evidence before the court upon the motion, excepting that shown by the examination of the various jurymen on their *voir dire.* With the exception of L. A. Weller, the justice of the peace, there is not a witness who expressed an opinion that he thought a jury could be obtained that would not be influenced by the public sentiment against the defendant. The sheriff thought it possible to get such a jury, but he would not say he thought it probable. George Watt was of the opinion that he had cooled down sufficiently so that he could give defendant a fair trial, and he expressed himself to the effect that the sentiments of most of the people ought to be the same as his own; but he did not venture the opinion that he believed they were. One hundred and seventy-five jurymen were examined before the jury was finally obtained, and it appears that the available jurymen of the county were

very nearly exhausted when the jury was secured. Of the talesmen examined, one hundred and forty-three were excused by the court for having formed or expressed unqualified opinions touching the guilt or innocence of the defendant, and, all things considered, there can be but little, if any, doubt that the opinion formed or expressed went to the guilt of the accused. After deducting from the list those that were excused for other causes, it is safe to say that eighty-five per cent of the jury lists had formed or expressed an ·unqualified opinion as to the guilt or innocence of the defend-. ant. Of the jury that was finally secured to try the case, five, who resided in or near the towns of Austin or Battle Mountain, had expressed qualified opinions touching the guilt or innocence of the defendant that they stated would take evidence to remove and. of the five it has been strenuously contended that two, at least, were shown to have been disqualified, namely, L. A. Lemaire and E. W. Hunt.

L. A. Lemaire, after testifying, and showing satisfactorily, we think, that the opinion which he then had was a qualified one, testified as follows concerning the expression of an opinion: "Q. Have you expressed an opinion as to the guilt or innocence of the defendant? A. Yes, sir. Q. Was that opinion expressed with a qualification, or just an expressed opinion without a qualification? A. The opinion is from what I have heard and read of the matter. Q. Did you qualify it when you expressed it? A. I don't think I qualified it. * * * Q. You stated that you have expressed an opinion, and without any qualifications? A. Yes, sir." Upon examination by the district attorney the juror testified: "Q. Mr. Lemaire, if I understand you correctly, you say that the opinion you expressed was one you had formed from what you had heard and read? A. Yes, sir. Q. You based your opinion on that? A. Yes, sir. Q. You have not heard any of the proceedings in the case? A. No, sir. Q. You were not present at the coroner's inquest or the preliminary examination? A. No, sir. Q. Then you have not heard any opinion, except that which you have formed on what you have heard and read? A. No, sir. Q. Is that the

opinion you expressed? A. Yes, sir. Q. Did you, at the time you expressed that opinion, have in your mind the reservation that it was a qualified opinion, based on those things that you had heard and read? A. If I had not heard and read anything, I could not have formed any opinion. Q. Isn't your opinion something like this: If so and so is the case I believe so and so, or if matters I have heard are true I believe such and such a thing. Was that the nature of the expressions you made? A. I took what I heard and read to be the facts of the case, and expressed an opinion accordingly. Q. You had no reason to doubt what you had heard? A. No, sir. Q. It was on the strength of that that you expressed an opinion? A. Yes, sir." The court then examined the juryman as follows: "The Court: Do you know the difference between a qualified and an unqualified opinion? A. Yes, sir. Q. What opinion did you express? Was it qualified, or unqualified? A. I think it was a qualified opinion."

The expressing of an unqualified opinion touching the guilt or innocence of the defendant, when such opinion is not based solely upon newspaper reports, is by statute made a disqualification of a juryman, regardless of what opinion the talesman may actually have at the time of his examination. (Cr. Prac. Act, 340; Comp. Laws, 4305; *State* v. *Roberts*, 27 Nev. 449, 77 Pac. 598.) Mr. Lemaire, having been examined both as to the opinion which he then entertained and as to an expression of an opinion which he had previously made, must have confused the two propositions; for his answers given to the court and to counsel are in conflict. It is to be regretted that his attention was not called to this conflict, and the juryman given an opportunity to express himself so that there would be no possibility of a misunderstanding. From the examination of this juryman by counsel for the state, as well as the defendant, taken alone, we think the juryman would be disqualified. The answers given to the only two questions propounded by the court, taken alone, would show him to be a qualified juryman. Taking his whole examination upon the question of

the character of opinion he expressed, and it is contradictory, if not utterly confusing; a condition which one or two questions from counsel would have easily cleared.

E. W. Hunt testified that he had both formed and expressed a qualified opinion touching the guilt or innocence of the defendant. During the course of his examination the following questions were propounded and answers given: "Q. Have you ever expressed the opinion that the defendant was guilty or ought to be hung? A. No, sir. Q. Have you ever expressed the opinion that he was guilty? A. I have. Q. You have expressed that opinion? A. Yes, sir. Q. Do you entertain that opinion at this time? A. Not of the indictment. Q. Do you in any sense? A. I do of the act; yes, sir." Prior to the foregoing the following questions and answers appear in the examination of this juryman: "Q. How many people have you talked with about this case? A. Quite a number. Q. Have you heard expressions of a favorable opinion to the defendant? A. Yes, sir; one. Q. Outside of court? A. No, sir. Q. You have expressed your opinion a good many times? A. Yes, sir. Q. You have expressed it to the effect that the defendant was guilty, have you not? A. Not of the indictment; no, sir. Q. But he was guilty of the homicide? A. Yes, sir. Q. You have expressed the opinion that the defendant was guilty of the act? Is that what you said? A. I never expressed that opinion, because it is not necessary. There is no opinion on such a thing. Q. He is guilty of the homicide; you know that? A. I believe that to be true. I do not know it. Q. You have expressed an opinion that far, have you not? A. Yes, sir. Q. Have you expressed an opinion any further than that? A. I expressed a qualified opinion. Q. Further than the opinion that he committed the act? A. Yes, sir. Q. But it was a qualified opinion? A. Yes, sir. Q. You qualified it, then? A. Yes, sir. Q. How did you qualify it? A. By the word 'if.' "

While it is urged that, upon the testimony quoted, this juryman is disqualified, we will only consider his examination, the same as that of Mr. Lemaire, as a part of the case presented to the court upon a motion for a change of venue.

From all the facts and circumstances before the court, can it be said that it was an abuse of discretion to have denied defendant's motion for a change of venue? It must be apparent that the proper solution of the question here presented is of far greater importance than the mere question of the guilt or innocence of this defendant. The right of trial by a fair and impartial jury is one of the most valuable privileges guaranteed by constitution to the citizen. The law cannot be a respecter of persons, and say that this man shall be tried by a jury uninfluenced by public sentiment, and another man must take his chances with a jury that is subject to all the insidious forces that an almost universal public sentiment has time and again been demonstrated to wield. It is the glory of our judicial system that it throws the safeguards of protection from improper influences around the high and the low, the rich and the poor, alike. No matter how low a man may fall in the scale of human degradation, no matter how deep-dyed a criminal he may be, the law says he shall not be punished for his crimes, except upon a fair and impartial trial before an unprejudiced jury. If we are to say that the showing was in this case insufficient to warrant a change of venue, we have at least established a precedent that more of a showing than that here disclosed must be made before a change of venue can properly be had. But we do not believe such precedent should be established. It is shown here by overwhelming proof that it was almost the universal belief in the County of Lander that the defendant was guilty of the crime charged. The homicide was one which naturally would create a strong feeling of prejudice against the prisoner in a county of small population and where the person killed was very generally known, respected, and popular. Even if it were possible to procure a jury of twelve men from remote parts of the county who were not acquainted with the parties, and who had not heard the case discussed, and who could readily qualify, yet it would be hardly possible for such a jury not to become aware of the existence of such a general public sentiment; for the jurymen could not help but listen to the examination of the other talesmen, nearly nine-tenths of whom were dis-

qualifying themselves because of their opinions, a circumstance to be considered, with others in the case, even though it alone might not be sufficient to warrant a change of venue. In this case, however, a number of the jurymen selected to try appellant must have been acquainted with the public sentiment, independent of what might be disclosed upon the examination of other jurymen.

As apropos to the case now under consideration we quote from an opinion of the Supreme Court of Iowa in the case of *State* v. *Crafton*, 89 Iowa, 109, 56 N. W. 257: "Each case must depend upon its own particular facts and circumstances. We know how difficult it is for an appellate court to see these matters as they may have appeared to the trial judge, and hence it becomes us to be exceedingly careful in passing upon the question of the proper exercise of the discretion vested in the trial court. When, after due investigation, we are satisfied that the trial court has made a mistake, it is our duty to rectify it as far as possible. The language of this court in the case of *State* v. *Nash*, 7 Iowa, 347, is applicable in this case. It was there said: 'It is important, to maintain the usefulness of our judicial system, that no suspicion of influence from popular excitement in the administration of the law should be allowed to impair the public confidence in the fairness and impartiality of judicial proceedings. An excited state of public feeling and opinion is always the most unfavorable for the investigation of the truth. Not only should the mind of the juror be wholly without bias and prejudice, it should not only be free from all undue feeling and excitement in itself, but it should be, as far as possible, removed from the influence of prejudice and feeling and excitement in others.' A man charged with the commission of the grave crime of murder has a right to be tried by an impartial jury and in a community where his case has not been prejudiced and prejudged. It matters not what the standing or reputation of this defendant may be, or how low his condition, the law throws around him all the safeguards which the enlightened wisdom of the ages has shown essential to the safe, orderly, and impartial administration of justice. Considering the magnitude of the crime charged, the

limited time between the homicide and the trial, the showing made for a change of venue, and the weakness of the resistance, we are impressed with the conviction that the court below erred in overruling defendant's motion."

Also from the opinion of the Supreme Court of Alabama in the case of *Seams* v. *State*, 84 Ala. 410, 4 South. 521: "We repeat that the trial must be just, as well as the verdict reached through its appliances. This cannot be done as long as the minds of the jury are liable to be influenced by a prevailing public prejudice against the prisoner. When excitement runs high, and a public sentiment generally or widely prevails which would justify or tolerate a dealing with the prisoner by the culpable modes of mob violence, which is the enemy of all law and good government, it is difficult to keep the infection of such prejudice from finding its way into the jury box, however honest in purpose the jury may be, or however enlightened may be the community from which they come. The duress of public opinion is often insidious and potent, and the best of men sometimes become its victims without being aware of it, or without the courage to resist the dominion of its influence."

See, also, *People* v. *Suesser*, 132 Cal. 631, 64 Pac. 1095; *State* v. *Manns*, 48 W. Va. 480, 37 S. E. 613.

As we have before stated, each case must depend upon its own particular facts and circumstances; but none of the numerous cases cited by counsel for the state, in our judgment, afford a precedent for sustaining the order of the court in this case.

The defense of insanity, superinduced by alcoholism, was interposed by the defendant. Two physicians, Dr. W. L. Samuels and Dr. Monihan, testified that, from their examination of the defendant and from the evidence adduced, the defendant was, at the time of the homicide and at the time of their testifying, suffering from alcoholic insanity, and was mentally irresponsible for his acts. Dr. A. L. Mann, from what would appear to be equal opportunities of examination and observation and from the evidence adduced, testified on behalf of the state that the defendant in 'his opinion was sane, both at the time of the homicide and at

the time of the trial. This disagreement in the views of physicians of standing upon a question of so great importance serves to illustrate how dangerous it might be for such a vital question, upon such a conflict of testimony, to be left to a jury selected from the body of a county, where it may be reasonably presumed from the evidence adduced that nearly nine-tenths of the residents of the county believed unqualifiedly in the guilt of the defendant, and where nearly half of the jurymen were selected from those portions of the county where the feeling was most general and bitter, and who showed by their examination that they were aware of the public feeling and were themselves possessed of qualified opinions as to the guilt or innocence of the defendant which would require evidence to remove. From all the facts and circumstances of this case we think a jury selected as this one was would likely be influenced more or less by the general public feeling, instead of being governed entirely by the evidence introduced upon the trial.

For the reasons given, the judgment is reversed, and the trial court is directed to grant the motion for a change of venue, for the purposes of a new trial, which is ordered.