[No. 1739.]

In the Matter of PETER BREEN, for Disbarment.

1. Contempt — Publications Relating to Courts — Criticisms of Opinions. One may criticize an opinion of a court, take issue with it on its conclusions of law, or question its conception of the facts, so long as his criticisms are made in good faith, and in ordinarily respectful language, and when not designed to wilfully or maliciously misrepresent the position of the court, or tend to bring it into disrepute, or lessen the respect due the authority to which a court is entitled.

2. Attorney and Client—Obligation of Attorneys. It is the duty of an attorney to observe the rules of courteous demeanor in open court, and to abstain out of court from all insulting language and offensive conduct towards the judges personally for their judicial acts, and for a breach of this duty an attorney may be suspended or disbarred.

3. Same—Power of Courts. Under Comp. Laws, 2625, authorizing the removal of an attorney by the supreme court for misconduct in office, etc., as well as independent of the statute, the supreme court has control over attorneys, and may suspend or disbar them for good cause shown, and, where an attorney of the supreme court unwarrantedly and without legal cause maligns a court of the state, the supreme court on proper showing may disbar him.

4. Same. The language of an attorney while acting in his capacity as district judge, but not made in any judicial proceeding pending before him, that a statement in an opinion of the supreme court that the evidence in a homicide case showed that accused at the time he killed decedent intended to kill another was like other assertions made in an "abnormally strange document" (referring to the opinion), and was neither fair to the prosecuting attorney nor to the district court, and whether or not it was made for the purpose of bolstering up a decision which is neither founded on·law nor supported by fact, and was a palpable reversal of a case which for forty years had been the accepted law in the state, it was "highly reprehensible for its author or authors to have made it; * * * reprehensible if the court knew what it was doing, pitiful if it did not," was not within the province of legitimate criticism, but was an unwarranted attack on the court, warranting the disbarment of the attorney, though he claimed that he did not intend any disrespect to the court, and though he claimed that he was not aware that the prosecuting attorney in his argument in the supreme court had stated that the evidence in the case showed that accused at the time of the killing of decedent intended to kill another.

PROCEEDINGS for the disbarment of Peter Breen, an attorney. Judgment of suspension, until further order of the court, and disbarment, subject to conditions, awarded.

The facts sufficiently appear in the opinion.

*R. C. Stoddard*, Attorney-General, for Affiant:

I.　In this matter a change of venue in a criminal case had been ordered by the supreme court, and the same was to be tried *de novo* in an adjoining county. The remittitur having been returned and filed, and the defendant removed to the county where the cause had been tried, the court proceeded to make and enter an order changing the place of trial in accordance with the judgment of the appellate court. Immediately after said order had been made and entered, and the defendant, who was still in custody, had been removed from the court room, the district attorney addressed the court and commented upon the action of the supreme court in reversing the trial court in said cause, and the judge of said trial court replied thereto, and caused the remarks of both to be duly recorded in the minutes of the court. The nature of the remarks of both court and district attorney, and the action of the court in having the same recorded, are alleged to constitute a contempt of the supreme court, which caused the proceedings to be instituted. Independent of the authority granted by statute, every court of general jurisdiction, in the absence of a limitation placed upon it by the creating power, has the inherent right to punish as a contempt any act, which tends to defame and degrade the court in the eyes of the public, or to embarrass, to obstruct, to belittle, to interrupt, to impede, or to prevent the administration of justice. (*In re Chartz*, 29 Nev. 110; *In re Chadwick*, 109 Mich. 588; *Fishback* v. *State*, 131 Ind. 304; *Neel* v. *State*, 9 Ark. 266; *State* v. *Morrill*, 16 Ark. 384; *People* v. *Wilson*, 64 Ill. 195; *People* v. *Green*, 9 Colo. 506.) See, also, "Constructive Contempt," 9 Cyc. 6, and authorities cited under foot-note 3.

II.　At the common law attachments were frequently issued against inferior judges and magistrates "for contempts in acting unjustly, oppressively, or irregularly in

their office, or in disobeying the writs issued from superior courts to them" (*Neel* v. *State*, 9 Ark. 266), or on account of any of that class of contempts, which is summed up by Blackstone as "demonstrating a gross want of that regard which, when once courts of justice are deprived of, their authority (so necessary for the good order of the kingdom) is entirely lost among the people." Such as speaking or writing contemptuously of the court or judges acting in their official capacity. (4 Cooley on Blackstone, 285, 286.) The statute (Comp. Laws, 3555) is simply declaratory of the common law, as the legislature cannot interfere with the jurisdiction of this court, or any of the district courts, on this subject. (*State* v. *Morrill*, 16 Ark. 384; *Little* v. *State*, 90 Ind. 338; *Fishback* v. *State*, 131 Ind. 304.) So far as this court is concerned, the matter is still pending, and may be said to be pending as long as the right of appeal exists. In a leading case the court said: "The pendency of an action does not terminate with the return of the verdict of the jury or the rendition of the judgment, but may be said to be pending while it remains *in fieri*, for, after judgment, the parties are still in court for certain purposes." (*Fishback* v. *State*, 131 Ind. 304; *In re Chadwick*, 109 Mich. 602.)

III. "An attorney and counselor may be removed or suspended by the supreme court, and by no other court in the territory, for either of the following causes arising from his admission to practice: Third—For misconduct in office, or for good cause shown." (Comp. Laws, 2625.) Contempt, as a sufficient ground for disbarment, is sustained by the following authorities: *People* v. *Geeen*, 9 Colo. 506; *In re Wooley*, 11 Ky. 95; *Ex parte Robinson*, 19 Wall. 505; *Beene* v. *State*, 22 Ark. 149; "Constructive Contempt," 9 Cyc. 6, note 9.

*Campbell, Metson & Brown, Campbell, Metson, Drew, Oatman & McKenzie, W. B. Pittman, Charles Lewers*, and *Bartlett & Thatcher*, for Respondent:

I. When the language complained of was published it was with reference to a decision in a case no longer pending. Therefore no contempt could have been committed. Comp. Laws, 3555, is practically the same as the common

law in existence at the time of the Declaration of Independence. The common law of England, as laid down by Blackstone, in this respect had been modified to a large degree when our Constitution was adopted, and the rule laid down by the text-writers, and borne out by the adjudged cases, would seem to be that the power now to punish for contemptuous publication exists only where the same is made in an attempt to influence the decision of the court by intimidation in causes pending before it.

II. The section of the Nevada code upon the subject bears out this fact of the limitation of the power of the court in providing what acts shall constitute a contempt of court, as follows: "First—Disorderly, contemptuous or insolent behavior towards the judge, whilst holding court or engaged in his judicial duties at chambers, or towards referees or arbitrators while sitting upon a reference or an arbitration or other judicial proceeding. Second—A breach of the peace, boisterous conduct or violent disturbance in the presence of the court or in its immediate vicinity tending to interrupt the due course of a trial or other judicial procedure. Third— Disobedience or resistance to any lawful writ, order, rule, or process issued by the court or judge at chambers. Fourth— Disobedience of a subpena duly served or refusing to be sworn or answer as a witness. Fifth—Rescuing any person or property in the custody of an officer by virtue of an order or process of such court or judge at chambers. Sixth— Disobedience to the order or direction of the court made pending the trial of an action, in speaking to or in the presence of a juror concerning an action in which such juror has been impaneled to determine, or in any manner approaching or interfering with such juror with the intent to influence his verdict." Under this statute it is apparent that any contempt complained of must be made in a manner pending before the court wherein the contempt is alleged to have been committed. It does not appear upon the face of the affidavit of the attorney-general herein that there was any matter pending before the supreme court at the time the remarks claimed to have been published by the respondent were so published, but the contrary appears affirmatively from the record. The appeal of Dwyer had been determined

by this honorable court; the time in which to make an application for a rehearing had expired; the remittitur had gone down and the case had been transferred from the District Court of Lander County, presided over by the respondent, to another county for trial. This respondent was in exactly the same position as any other citizen of the state who exercises the right of free speech, and should be treated accordingly, irrespective of the fact that he occupies a judicial position. The statute of Nevada in this respect is but a replica of the statutes of many of the other states of the Union, and the adjudications of the courts of last resort of nearly all the other states establish the fact that to subject an author of a publication to a punishment for contempt, the publication must have been made in relation to a pending action.

III. Says Brewer, J., while sitting as a member of the court of last resort of Kansas, in the case of *In re Pryor*, 18 Kan. 72: "For no judge, and no court, high or low, is beyond the reach of public and individual criticism. After a case is disposed of, a court or judge has no power to compel the public or any individual thereof, attorney or otherwise, to consider his rulings correct, his conduct proper, or even his integrity free from stain, or to punish for contempt any mere criticism or animadversion thereon, no matter how severe or unjust."

IV. We might continue *ad infinitum* citing cases, but think, from the decisions called to the attention of the court, it is manifest that the rule is, as laid down by the Supreme Court of the United States, that "when a case is finished, courts are subject to the same criticism as other people." And the very object of the limitation of the statute to causes pending before the court is that, during the pendency of specific judicial proceedings, courts must be permitted to administer justice without intimidation or molestation either within or without their immediate presence. After a case has been fully determined, no such necessity exists, and any publication made with reference to the past decision of a court cannot tend in any way to embarrass the court or to influence its conduct or impede or interrupt it in the exercise

of its judicial functions.   Therefore, no reason could then exist for the exercise of that law of necessity which requires that the court shall have power in self-defense to punish summarily for contempts perpetrated in its immediate presence.   And where the contempt, as here, is purely constructive, if at all, and not arising with reference to a pending cause, a double reason exists to deny the jurisdiction of the court to punish the respondent for contempt.   The law of necessity could not be invoked by any process of reasoning as a bias for the preservation of its dignity, the alleged contemptuous publication having been made without the presence of the court and with reference to a case that had been determined.

V.   The respondent knew what had transpired in his own court; knew the theory upon which Mr. Maestretti had prosecuted the case in his court; knew that Mr. Maestretti had been present and taken part in the argument before this honorable court, and, relying upon the statement made, and believing that this court had purposely gone outside the record to reflect upon the district attorney because of the manner in which he had tried the case, and with the intent to insult this respondent and to criticise his rulings in this case while it was before him, thereupon made the remarks attributed to him.   These remarks were the result of a misapprehension of the true condition of affairs, and were, when made, actuated by a belief on the part of respondent that the supreme court of the state had, as before stated, gone outside of its way for the purpose of thus criticising him for following what he believed to be the law by which he was bound, namely, the Millain case, covering an almost identical state of facts.   It afterwards appeared that the information thus given by Mr. Maestretti in open court to this respondent was incorrect; that this young man in the stress of his private troubles and public duties had forgotten his consultations with the attorney-general and the argument made before the supreme court upon the theory of mistake, and that such theory was within the record as presented to that court by its prosecuting officers.

VI.  Eliminating from consideration the legal defenses to

his action which have been offered on behalf of respondent,
and confining itself simply to the acts shown in this pro-
ceeding, we feel that this honorable court will favorably
consider all of the circumstances surrounding this matter.
Respondent has fully and fairly stated the provocation and
misunderstanding which led to the using of the alleged con-
temptuous language; he has disclaimed any intent to reflect
upon the judicial dignity of this court thereby; he has
expressed his willingness to make reparation by expunging
the offending words from the records of his court, and that
he would have done so before were it not that he felt bound
to refrain from so doing until this proceeding had been
determined upon the order of this court to show cause. We
appreciate the great power of this court to impose punish-
ment in a case where it felt that it had jurisdiction to do so.
While sitting in the usual capacity of accuser, judge and
jury, it might hold within its hands the power to punish and
humiliate the respondent, who for many years has been an
honored member of the bench and bar of Nevada, and who
has throughout his professional and judicial career always
upheld the dignity of this court, as well as of that branch of
the judiciary of which he is a member. Recognizing the
sense of offended dignity which animates this court, but also
recognizing the facts concerning the alleged offense, which
we think respondent has fully and fairly explained to this
honorable court in such wise as to show no offense was
intended, but offered his apology therefor, we ask of this
court to suggest the expunging of the offending words from
the records of the trial court, and to dismiss the citations,
both of which are based up the same principles of law.

PER CURIAM:

In the case of *The State of Nevada* v. *Patrick Dwyer*, 29
Nev. 421, on appeal to this court from a conviction of
murder in the first degree and sentence of death, the judg-
ment and order denying a motion for a new trial were
reversed on the 12th day of August, 1907. The reversal
was upon the sole ground that the trial court erred in not
granting defendant's motion for a change of venue.

The opinion was a lengthy one, written for the court by NORCROSS, J., the full bench concurring.   During the course of the opinion the following statement was made:   "The theory of the state, if we understand it, was that the defendant killed Williams by mistake, thinking the latter was one O'Brien, a man with whom defendant had had trouble during the day over a prostitute."

It will appear from an examination of the opinion in the case that this statement quoted was only an incidental observation of what this court understood was the fact, and was not the statement of anything in any way deemed essential to the determination of the question upon which the case was decided.   The statement quoted, however, was in strict accordance with the position taken in the brief of the attorney-general and in the oral argument of A. J. Maestretti, District Attorney of Lander County, upon the hearing of the appeal, it being contended in this court that certain testimony, objected to by defendant's counsel, was admissible upon this theory.   The testimony itself, introduced by District Attorney Maestretti in the state's case in chief, showing the quarrel between Dwyer and O'Brien on the same day and just before the killing of Williams, and that Dwyer and O'Brien threatened to kill each other on sight, was such as to suggest the theory of mistake, even if such theory had not been argued to this court, and apparently was admissible on the state's case in chief only on this hypothesis as tending to show the motive and purpose of the shooting. The record in the Dwyer case, however, does not show that counsel in the district court declared it to be the theory of the state that Dwyer killed Williams through mistake, and the answer of District Attorney Maestretti sets up that that was not his theory at the trial, that he offered evidence as to the trouble with O'Brien to show the state of mind of defendant at the time, although as a matter of fact he admits that the only inference to be drawn from the record is that Dwyer killed Williams by mistake, which is in accordance with his own belief.

In the oral argument in this court on the appeal in the case of *State* v. *Dwyer*, following the point made by the

attorney-general in his brief, District Attorney Maestretti made the following statement: "There is one point I did not intend to touch upon, but I have been requested to do so, and in examining the records the court will find, and I suppose that is the reason the objection is taken, that the feeling or intent to take life was not as to Williams, but as to O'Brien, and that the killing of Williams, it will be discovered by this court, must have been an accident, that Dwyer meant to get O'Brien and not Williams, and upon that point we have collected a few authorities which we wish to call to the attention of this court. (*Jackson* v. *State*, 106 Ala. 12, 17 South. 333; *McGehee* v. *State*, 62 Miss. 772, 52 Am. Rep. 209; *People* v. *Torres*, 38 Cal. 141; 21 Am. Ency. Law, 104, 105.)"

After the time had elapsed for the filing of a petition for a rehearing, and no such petition being filed, remittitur was issued. On the 13th day of September, 1907, the defendant was brought before the trial court, and the order of this court directing a change of venue, for the purpose of a new trial, carried out.

After the order for a change of venue had been made, the said A. J. Maestretti, Esq., District Attorney of Lander County, made the following statement in open court: "If it pleases the court at this time, I wish to rise to the question of privilege in relation to a statement made in the disposition of this case, wherein it was reversed in the supreme court, and that is this: In its decision the supreme court has stated in substance that the theory of the prosecution in this case was that Dwyer killed Williams through mistake, while looking for a man named O'Brien, with whom the defendant had had trouble during the day over a prostitute. I wish to state at this time that that is absolutely not the fact; further, that there is nothing in the records from the first page to the last which suggests or would warrant the supreme court in making such a statement in its decision, and where anything is shown on that record upon which the supreme court renders such a decision is beyond my understanding."

Upon the conclusion of the foregoing statement of A. J. Maestretti, Esq., the District Judge, respondent herein, made

the following statement and order: "I heartily commend you, Mr. District Attorney, for the steps you have taken to set yourself right with the ·public in a matter so closely connected with your onerous official duties. The statement in the decision of the supreme court which you contradicted I also know to be absolutely without foundation. You were alone in the case for the state, and you did not conduct its prosecution upon the theory of mistake, nor is there anything in the records to so indicate. The supreme court, being the tribunal under our judicial system to which has been given, so to say, the last word, that tribunal, it seems to me, should be exceptionally careful to make no statement having a tendency to unjustly reflect upon or misstate the position of any officer, witness, or person connected with the trial of a cause. So far as it appears to me by the stenographic record of the case on file, the statement in the opinion as written by Judge NORCROSS, to which objection has been made, like some other assertions in the same abnormally strange document, in my opinion, is neither fair to you as prosecuting officer, nor to this court, and whether or not it was made for the purpose of bolstering up a decision, which, to my mind, is neither founded on law nor supported by fact, and is a palpable reversal of the Millain case, which for forty years has been the accepted law in this state pertaining to a change of venue in a criminal case, it was highly reprehensible for its author, or authors, to have made it. I say reprehensible—as a modification I shall say reprehensible if the court knew what it was doing, pitiful if it did not. Mr. Clerk, you will enter in your minutes the statement of the district attorney side by side with the remarks of the court."

The statements of respondent and of A. J. Maestretti. so entered in the minutes of the Third Judicial District Court, in and for the County of Lander, were published in the press of Lander County and widely copied throughout the state. The attention of this court having been directed to the published account of the proceedings had in the said district court, an order was made directing the attorney-general to investigate the matter, and, if he found the same

to be as published in the press reports, to present the facts
to this court in the form of an affidavit.  Pursuant to such
order the attorney-general filed an affidavit setting forth all
of the facts, and upon which affidavit this court ordered
citations issued, and directed to respondent herein and to
the said A. J. Maestretti to appear and show cause, if any
they have, why they should not be adjudged guilty of con-
tempt of this court and punished accordingly, and, further,
that they show cause, if any they have, why they should not
be adjudged guilty of conduct unbecoming members of the
bar of the state and be disbarred.

Respondent appeared in response to the citation, and filed
an answer to the affidavit of the attorney-general.  The
answer admits that respondent made the statement and order
heretofore quoted.  As justification therefor, he avers that he
was not aware that the attorney-general and said District
Attorney Maestretti had taken the position in this court that
Dwyer killed Williams by mistake, thinking the latter was
one O'Brien, until he was served with a copy of the affidavit
of the attorney-general; that, when the district attorney
made the statement in the district court copied into the min-
utes, respondent understood and believed that no such theory
had ever been mooted by the prosecution, as none such was
ever urged or adopted in said district court; that at said
time respondent understood that this court in rendering its
opinion and decision, and in using the language therein
relative to the theory of the state, referred solely to the pro-
ceedings in the district court during the trial of said Patrick
Dwyer, and not to the proceedings in the supreme court;
that, when said case was on trial in the said district court,
respondent believed the case of *State* v. *Millain*, 3 Nev. 409,
to be the leading authority in this state upon the question of
change of venue in a criminal case, and an authority upon
the qualification of jurors; that respondent considered his
court bound by the Millain case, and believed that this
court had overruled said Millain case without so stating;
that respondent, believing that this court in its opinion
"was stating matters and things that happened at the trial
in said district court and criticizing wrongfully and unjustly

the district attorney in his conduct of said trial and the
ruling of respondent therein, and being without any informa-
tion whatsoever of even the word 'mistake' having been
uttered in connection with the homicide in the argument
before the said supreme court, as it had not been before
the district court, respondent made the statements and
caused them to be entered in the minutes of the District
Court of Lander County; that had respondent known of the
question of mistake having been mentioned when the remarks
of respondent objected to were being made, he would have
modified or omitted altogether the last paragraph of said
remarks, and now stands ready to obey the order of the
court in that respect, not that mistake was ever relied on at
the trial in the district court, for such is not the fact, but
because the reference to mistake by the attorney-general
before the supreme court might have misled said court in
its ruling; that when defendant read in the opinion of the
Supreme Court of the State of Nevada the following lan-
guage, to wit: 'The theory of the state, if we understand it,
was that the defendant killed Williams by mistake'—he, the
said defendant, felt not only aggrieved, but that an unjust
reflection had been cast upon his court, for the reason that
under such a theory it would have been the duty of said dis-
trict court to have given an instruction to the jury upon
the law as to what degree of crime, if any, a homicide com-
mitted by mistake belonged to, and, as no such instruction
was given or asked for, the said defendant, for the time
being at least, believed certain of his rulings were not fully
considered by said supreme court. Defendant with all pos-
sible deference claims the right at all times to differ in
opinion with the supreme court, state or national, or any
of the judges thereof, or their opinions on matters of law,
if in his judgment they are fairly the subject of comment,
but he does not believe and never has in criticizing unfairly
any court, judge, or opinion, and will not do so, and defend-
ant denies emphatically that in any action or word of his
it was his intention to impugn the integrity, honor, or dig-
nity of the Supreme Court of the State of Nevada or any of
its honorable members, and defendant is surprised and dis-

appointed that the affidavit of the attorney-general should contain aught tending to question the respect of defendant for said supreme court and the members thereof. Defendant deeply regrets the happening of the incident which has given rise to these proceedings, and regrets that his language used as aforesaid should have received the construction given it in the said affidavit of the honorable attorney-general, for such was not the intention of defendant at the time, and never has been."

The question is presented for determination whether or not the language and order of respondent in question, in view of respondent's answer, is contemptuous or constitutes a breach of the duty which respondent as a member of the bar of this court is bound to observe, and, if it does, whether the offense is sufficiently grave to warrant disbarment or other action upon the part of this court. In fact, the question is presented whether or not the language and order could, in any event, be deemed contemptuous or warrant any action upon the part of this court, upon the theory that they are but criticisms of an opinion of a court which it is the province of any one to indulge in, irrespective of whether such criticisms are just or unjust, or whether or not they are couched in respectful language. The right to criticise an opinion of a court, to take issue with it upon its conclusions as to a legal proposition, or question its conception of the facts, so long as such criticisms are made in good faith, and are in ordinarily decent and respectful language, and are not designed to wilfully or maliciously misrepresent the position of the court or tend to bring it into disrepute, or lessen the respect due the authority to which a court of last resort is entitled, cannot be questioned. To attempt to declare any fixed rule marking the boundaries where free speech in reference to court proceedings shall end would be as dangerous as it would be difficult. The right of free speech is one of the greatest guaranties to liberty in a free country like this, even though that right is frequently and in many instances outrageously abused. Of scarcely less, if not of equal, importance, is the maintenance of respect for the judicial tribunals, which are the arbiters of questions involv-

ing the lives, liberties, and property of the people. The duty and power is imposed upon the courts to protect their good name against illfounded and unwarranted attack, the effect of which would be to bring the court unjustly into public contempt and ridicule, and thus impair the respect due to its authority. While it is the duty of all to protect the courts against unwarranted attack, that duty and obligation rests especially upon the members of the bar and other officers of the court. It would be foolish, as well as useless, for any one to contend that the very highest courts do not make mistakes. Courts themselves prove this by over-ruling previous decisions. The rules of this court, as in the case of all appellate courts, provide that after a decision is rendered the losing party has the right of petition for rehearing in order to call the court's attention to what is deemed a misconception of the case or an erroneous view of the law. This court has frequently granted rehearings, and there are several instances where the previous decision was either modified or a contrary view of the law taken in the final decision. It is appropriate here to say that, if the district attorney in the Dwyer case believed that this court had misconceived the facts of the case or misapplied the law in any material particular, the way was open to him, and it was his duty to have sought to have the same corrected upon petition for rehearing. If the trial judge observed that a mistake had been made either in fact or law, or thought that the opinion was so framed as to put his court in a false light, a suggestion from him to counsel would doubtless cause the matter to be properly presented to the court and the same investigated, and, if error was found to have been made, it would be corrected. Neither the district judge nor the district attorney saw fit to pursue such a course. This would be, at least, a more ethical procedure than to wait until opportunity to correct an error had passed, and then abuse the court for such alleged error. Even if this court had fallen into error in the statement which it incidentally made regarding what it understood to be the state's theory of the case, we cannot see any occasion for such strictures as those contained in respondent's statement, especially as

no ruling was based thereon. Even if counsel for the state had not specifically argued in this court the theory of mistake, the expression might have been made, as we have before stated, very naturally in view of the testimony in reference to the quarrel between Dwyer and O'Brien, and Dwyer searching for O'Brien just previous to the shooting; the record being silent as to any positive statement negativing the theory of mistake, and no contention ever having been made either in this or the Dwyer proceeding that this evidence was admissible upon any other theory.

What respondent said with regard to the Dwyer case being a reversal of the Millain case, if it could be segregated from the balance of the statement, could hardly be considered objectionable from any view, although we would have to disagree with the learned judge as to the effect of the opinion in the Dwyer case. The Millain case was tried in Storey County at a time when the population of that county was many times greater than that of Lander County at the time of the Dwyer trial, and the courts have distinguished between communities with a meager and a large population. In the Millain case, after the motion for change of venue was made, the court proceeded and apparently without difficulty obtained twelve competent jurors from the number who were in attendance. It seems that but a small fraction of the number in Storey County at that time were called or examined. In the Dwyer case nearly all the jurors obtainable in Lander County had been summoned on different venires and examined before twelve were obtained, and several of these retained to try the case showed on *voir dire* that they had opinions bordering on disqualification. Of the numerous witnesses examined on behalf of the state and the defendant on the motion for change of venue, only one stated that he believed that Dwyer could have a fair trial in that county. Threats had been made to take him from the sheriff and execute summary vengeance. Dwyer, a migrating gambler and stranger in Austin, had soon after his arrival there killed an innocent, popular, and worthy young man who had long resided in that place and was well known to all the residents, and naturally, owing to this deplorable incident, a strong feeling

existed there against the defendant, although it alone may
not have been sufficient to warrant a change of the place
of trial.   In other respects the two cases are distinguishable
on the facts.   We quoted from the Millain case, and had no
thought of reversing it.   But, however, we do not question
the right of respondent to differ with us in the view he takes
of the two cases.   We do not question the right of respondent
to take the view he did of the Millain case.   When he came
to the conclusion that the Millain case was controlling, and
under the interpretation which he placed upon it required
that he deny the motion for a change of venue, it became
his duty to decide according to his conclusion.   Upon appeal
the case came under the prerogative of this court, and it was
our province and duty to decide the appeal as we became
convinced it should be decided.   There is no word of criti-
cism in the Dwyer opinion "or unjust reflection" upon either
the conduct of the district attorney or the trial judge, unless
a respectful disagreement with the trial court upon a matter
of law can be called a criticism, and we do not think it
properly can be so called.

Respondent, considering that this court had erroneously
stated as a fact something which, in his opinion, was unwar-
ranted from the record, and which he characterized as stated
possibly "for the purpose of bolstering up a decision" which,
to his mind, "is neither founded on law nor supported by
fact," proceeds to declare the opinion as a whole to be an
"abnormally strange document," that it was unfair both to
the district attorney and the trial court, and a reversal of a
former decision which had been the accepted law of this
state for forty years.   All of this is further characterized as
"reprehensible if the court knew what it was doing, pitiful
if it did not."   It cannot reasonably be claimed in this case
that the remarks of respondent are mere criticisms of an
opinion of this court, which were inadvertently made because
of misinformation as to what transpired in the presentation
of the case upon appeal.   It appears from the statement
quoted that the assumed error upon the part of this court
in reference to the theory of mistake was only made the
excuse for the offensive language used in commenting upon

the opinion as a whole. That respondent was in error in regard to all of his references to the opinion of this court would not have been deemed an occasion for citation, if such comments had not been expressed in language reflecting upon the honor, integrity, and dignity of this court. But respondent did not see fit to couch his criticisms in respectful language. Upon the contrary, the whole tenor of the statement and order of respondent is not only highly disrespectful, but contains covert intimations of grave misconduct upon the part of this court. To suggest that a court uses a false statement of a fact to "bolster up" an opinion characterized as an "abnormally strange document" is an intimation that the court is guilty of such conduct as would justly warrant the impeachment of every member. This intimation, however, is modified by its author, so that the conduct of the members of this court is declared to be "reprehensible" only in the event "the court knew what it was doing," otherwise the position of the court would be only "pitiful." These observations and intimations are made by an attorney and officer of this court while acting in his capacity as a district judge, though they are not made in any judicial proceeding pending before him. That they were made with the view of receiving public attention is evidenced by the fact that they are ordered spread upon the minutes of his court to remain a perpetual impeachment of this court. There can be but one effect of such language published to the world by one holding the high and responsible position which the respondent holds. That effect is to destroy, in a measure at least, public confidence in the integrity of the highest tribunal in the state, and thus impair the respect due its authority. To publish such statements as those of respondent's in a community where the feeling had recently been high, and in places bordering upon mob violence, might result in the gravest wrong. If any considerable portion of a community is led to believe that, either because of gross ignorance of the law or because of a worse reason, it cannot rely upon the courts to administer justice to a person charged with crime, that portion of the community, upon some occasion, is very likely to come to the conclu-

sion that it is better not to take any chances on the courts failing to do their duty. Then may come mob violence with all its detestable features. To say that respondent meant no disrespect for this court is contrary to the plain meaning of the language used, and the order directing that it be spread upon the minutes of the district court.

Is the making of the false and defamatory statement by respondent a violation of his duty as an attorney and officer of this court? "It is the duty of an attorney not merely to observe the rules of courteous demeanor in open court, but also to abstain out of court from all insulting language and offensive conduct towards the judges personally for their judicial acts. For a breach of this duty an attorney may be suspended or disbarred." (4 Cyc. 908, and authorities cited.) Both by statute (Comp. Laws, 2625) and inherent power, the supreme court is given control over attorneys who receive a license to practice through its authority to suspend or disbar them for good cause shown, and this is in no way a violation of their constitutional privilege. If any attorney of this court unwarrantedly and without just and legal cause maligns a court in this state, this court, upon proper showing, may disbar him. Any tribunal that cannot tolerate free discussion and criticism of its decisions is justly entitled to contempt, but, on the other hand, little respect is due to a court that will hesitate to check or discipline any of its attorneys or officers who are so devoid of professional ethics and ordinary courtesy as to misrepresent and vilify it in open court without any cause or semblance of reason.

In regard to respondent's claim that he did not intend any disrespect, and that he was not aware that the prosecution in the Dwyer case had advanced anything in this court regarding the theory of killing by mistake, it may be said that with words, as with acts, it is presumed that the offender intended their plain meaning and natural and probable consequences. If the term "reprehensible" and "pitiful" as used by respondent are not clearly disrespectful and scurrilous, it is hard to conceive of any that would be, and it is but reasonable to conclude that they were employed and spread upon the minutes by respondent in an effort to

belittle and discredit this court in its opinion for the purpose of trying to sustain his own before the bar of public opinion in a community where a strong feeling existed in regard to the Dwyer case. In *Re Chartz*, 29 Nev. 110, a decision filed March 1, 1906, an attorney of this court had his brief stricken out, was reprimanded and warned and charged with costs of the proceedings for stating in the brief that in his opinion the decisions favoring the power of the state to limit the hours of labor, on the ground of the police power of the state, were wrong and written by men who had never performed manual labor, or by politicians and for politics, and that they did not know what they wrote about. In that case we said: "By using the objectionable language stated respondent became guilty of contempt which no construction of the words can excuse or purge. His disclaimer of any intention of disrespect of the court may palliate, but cannot justify, a charge which under any explanation cannot be construed otherwise than as reflecting on the intelligence and motives of the court." A number of decisions regarding misconduct by attorneys are reviewed in that case. We quoted with approval language holding that, where words are offensive and insulting *per se*, the offender may be punished, and that the disavowal of any intention of disrespect may tend to excuse, but cannot justify, them. We there quoted with approval from *Sears* v. *Starbird*, 75 Cal. 91, 16 Pac. 531, 7 Am. St. Rep. 123, where an attorney was censured and his brief was stricken out by the Supreme Court of California because it contained reflections upon the judge of the superior court. This was equivalent to saying that we will protect the district courts of this state from the abuse of attorneys who are officers of this court, and we feel justified in extending the same protection to this tribunal. In line with other decisions cited there we quoted from the opinion of the chief justice, speaking for the court, in *State* v. *Morrill*, 16 Ark. 384: "If it were the general habit of the community to denounce, degrade, and disregard the decisions and judgments of the courts, no man of self-respect and just pride of reputation would remain upon the bench, and such only would become the ministers of the law as were insensible to

defamation and contempt.  But happily, for the good order
of society, men, and especially the people of this country,
are generally disposed to respect and abide the decisions of
the tribunals ordained by government as the common arbi-
ters of their rights.  But where isolated individuals, in viola-
tion of the better instincts of human nature, and disregardful
of law and order, wantonly attempt to obstruct the course of
public justice by disregarding and exciting disrespect for the
decisions of its tribunals, every good citizen will point them
out as proper subjects of legal animadversion.  A court must
naturally look first to an enlightened and conservative bar,
governed by a high sense of professional ethics, and deeply
sensible, as they always are, of its necessity to aid in the
maintenance of public respect for its opinions."

Nor is the fact that defendant did not know that the
district attorney and attorney-general had argued regarding
the theory of mistake in this court any justification.  As an
attorney and incumbent of the high office of district judge,
he knew, or certainly ought to have known, that it was not
proper for him to charge this court or any tribunal or indi-
vidual with any offense, however high or low, or with any
shortcoming simply because he did not know.  He was aware
of ample that had transpired before him when the evidence
was introduced by the prosecution in this case in chief of
the quarrel between Dwyer and O'Brien and that Dwyer had
threatened and was seeking O'Brien on the evening he killed
Williams, a stranger to him, to justify the statement made as
an inference in the opinion of this court to which he took
exception, even if the district attorney and the attorney-
general had not presented anything in their argument
regarding the theory of mistake.  It is the duty of all
attorneys to be honest and honorable, to conduct themselves
as gentlemen, and to show due respect and courtesy, to
enlighten and assist the courts, but never to attempt to mis-
lead or misrepresent regarding law or facts.  When they fail
in any of these respects, it is essential to the proper main-
tenance of the respect and dignity due to the court, and to
the proper administration of justice, that they be brought to
a realization of their duties by a reprimand, suspension, or

disbarment, and some times by fine and imprisonment. Although respondent, as well as all others, was at liberty to differ from and to criticize any opinion of this court, there is a broad distinction between difference of opinion or legitimate criticism, and mere misrepresentation or vilification sought to be justified on such misrepresentation. If respondent were unable to see any material difference between the circumstances existing in the Dwyer and Millain cases, it was his privilege to criticize the decision, and to say that in his judgment it was wrong, and a reversal of the Millain case; but, when he went further, and made a false statement regarding what had been presented to his court and followed his misrepresentation by vilifying and contemptuous words, as an attorney he passed beyond the freedom of discussion and criticism. Also, he must have been aware that he was not acting in impeachment charges, nor in any proceedings authorized by law, and that there was no warrant or authority for him as district judge to befoul the records of his court with the misrepresentation and disrespectful remarks, and consequently it seems that he had no purpose but a malicious one in so entering them, even if they could be considered permissible criticism. If mere abuse of this tribunal by its attorneys were to be encouraged or tolerated, there would seem to be no necessity or excuse for the entry of these scurrilous remarks in the record. The fact that defendant stands so high in esteem and as an able attorney and judge tends to aggravate rather than excuse his conduct. The greater his standing and ability the more careful he should be in word and act, and the better example he should set for attorneys practicing before his own and other courts. It may be said that after the order had been entered for a change of venue the case was removed to and pending in the District Court of Elko County, and liable to come here again on appeal. If it had been in some other court from the beginning, and never in respondent's, that would not have been justification for him to resort to such abuse and have it recorded. The position of a court in a case like the present is always a delicate one. No person regrets more than we that there was ever occasion for the present proceeding. Unpleasant, however, as it may be, we would not

be doing our duty to the court over which we have the honor and responsibility of presiding did we pass unnoticed the conduct of respondent. While attorneys have the widest latitude to differ with and to criticize the opinions of this or other courts, yet, when they resort to misrepresentation and unwarranted assaults upon the courts whose officers they are, they violate their duty and obligation. They should remember that as one of the conditions of their admission to practice they have taken an oath to support the government and Constitution of this state, under which the district and supreme courts were created, and to observe or perform the duties of an attorney, nor ought they forget that they are members of a profession which they should ever try to keep unsullied. The language and order of respondent, considered as a whole, is not within the province of legitimate criticism, but is of that character which is an unwarranted reflection upon the honor, integrity, and dignity of this court, the effect of which is to impair the respect due its authority, and constitutes a grave breach of professional propriety.

Because of the language and entry complained of, it is ordered that the respondent, Peter Breen, be suspended and prohibited from practicing or appearing as an attorney or counselor at law in any of the courts of this state until the further order of this court, and, unless within twenty days from the filing of this opinion he causes the language and order which he had so entered in the minutes of the district court to be expunged from the records of that court, and thereupon presents to this court an affidavit or other satisfactory evidence that said language and order have been so expunged, a further order will be entered by this court on the first day of its next term directing that his name be struck from the roll of attorneys, and disbarring him from thereafter appearing or practicing in any of the courts of this state.

[REPORTER'S NOTE: Respondent caused the objectionable matter to be expunged from the records of his court, within the time specified in the above order, and a certified copy of the said order was filed with the supreme court. Hence, the order of disbarment never took effect.]